IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| OCTAYVIA MCDONALD, | ) | |
| | ) | Case No. 19 cv 1101 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, Former | ) | |
| CHICAGO POLICE SERGEANT | ) | |
| RONALD WATTS, | ) | |
| ROBERT GONZALEZ, | ) | |
| OFFICER BRIAN BOLTON, | ) | |
| OFFICER ELSWORTH J. SMITH, JR, | ) | |
| OFFICER MANUEL LEANO, | ) | |
| PHILIP J. CLINE, | ) | |
| DEBRA KIRBY, | ) | |
| KAREN ROWAN, | ) | |
| and other as-yet-unidentified | ) | |
| officers of the Chicago Police | ) | |
| Department, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Octavyia McDonald, by her attorneys, Loevy & Loevy, hereby

complains against Defendants, City of Chicago, former Chicago Police Sergeant

Ronald Watts, Robert Gonzalez, Officer Brian Bolton, Officer Elsworth J. Smith, Jr.,

Officer Manuel Leano, Philip J. Cline, Debra Kirby, Karen Rowan and other as-yet-

unidentified officers of the Chicago Police Department, and states as follows:

## Introduction

1.      Octayvia McDonald was convicted and incarcerated for crimes she did not commit.

2.      The crimes never happened; they were completely fabricated by corrupt Chicago police officers.

3.      Theses corrupt officers victimized Ms. McDonald twice.

4.      Ms. McDonald was arrested on May 25, 2005, and again on August 8, 2005, in or around the Ida B. Wells housing complex, a location that was heavily policed by corrupt Chicago police officers.

5.      The corrupt officers sought bribes, planted drugs, and falsely accused many people, including Ms. McDonald, of possessing drugs.

6.      The type of encounter these police officers had with Ms. McDonald was unfortunately quite common, and the consequences were dire: false arrests, criminal proceedings, incarcerations, and a subsequent felony record.

7.      Realizing that she faced no chance of winning at trial, Ms. McDonald eventually pled guilty to both false arrests.

8.      After Ms. McDonald had completed her sentence, Defendants Watts and one of his accomplices, Chicago Police Officer Mohammed, were caught on tape engaging in the exact type of misconduct that Ms. McDonald had alleged against Defendant Watts.

9.      The federal government charged Watts and Mohammed criminally, and the disgraced officers pled guilty and served time in federal prison.

2

10.     Since then, evidence has come to light showing that Watts and his police team members engaged in a pattern of criminal misconduct against public housing residents and visitors and that the Chicago Police Department officials have long known about that pattern.

11.     The scope of this misconduct cannot be overstated.

12.     For example, the Chief Justice of Illinois's Court of Claims has written that "many individuals were wrongfully convicted as a result of one of the most staggering cases of police corruption in the history of the City of Chicago," explaining that "Watts and his team of police officers ran what can only be described as a criminal enterprise right out of the movie 'Training Day.'"

13.     The Court of Claims Chief Justice explained that "[o]n many occasions when these residents [of public housing] refused to pay the extortive demands the Watts crew would fabricate drug charges against them."

14.     The Illinois Appellate Court, too, has weighed in on the scope of the scandal, repeatedly calling Watts and his team "corrupt police officers" and "criminals" and chastising the City's police disciplinary oversight body for doing "nothing to slow down the criminals" from their rampant misconduct and perjury.

15.     On or around November 16, 2017, the Cook County State's Attorney Office (CCSAO) successfully moved to vacate the convictions of 15 individuals framed by the Watts outfit.

16. In light of the decision of the CCSAO, and recognizing the scope of misconduct that the City let go on for more than a decade unabated, many of the Watts crew were placed on desk duty.

17. Since then, three additional groups of victims were exonerated *en masse* on September 24, 2018, November 2, 2018 (including Ms. McDonald), and February 2019, respectively.

18. In recognition of the scope of their misconduct, the CSSAO will no longer call many of the Watts's crew members as witnesses "due to concerns about [their] credibility and alleged involvement in the misconduct of Sergeant Watts."

19. Through this lawsuit, Ms. McDonald seeks accountability and compensation for being deprived of her liberty as a result of Defendants' misconduct.

## Jurisdiction and Venue

20. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the Constitution of the United States.

21. This Court has jurisdiction over federal claims pursuant to 28 U.S.C. § 1331 and state law claims pursuant to 28 U.S.C. § 1367.

22. Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district and Defendant City of Chicago is a municipal corporation located here. Additionally, the events giving rise to the claims asserted herein occurred within this judicial district.

## The Parties

23.     Ms. McDonald is 31 years old. She currently resides in Chicago.

24.     At all relevant times, former Chicago Police Sergeant Ronald Watts, Robert Gonzalez, Officer Brian Bolton, Officer Elsworth J. Smith, Jr., and Officer Manuel Leano were police officers employed by the City of Chicago and acting within the scope of their employment and under color of law. Collectively, these individual Defendants are referred to as Defendant Officers.

25.     At all relevant times, Defendant Watts was a leader of the Second District Tactical Team that worked the Ida B. Wells housing complex.

26.     Defendants Robert Gonzalez, Officer Brian Bolton, Officer Elsworth J. Smith, Jr., and Officer Manuel Leano worked on Watts's tactical team.

27.     At all relevant times, Defendant Phillip J. Cline was the Superintendent of the Chicago Police Department.

28.     At all relevant times, Defendants Debra Kirby and Karen Rowan were Assistant Deputy Superintendent of the Chicago Police Department, acting as the heads of Internal Affairs Division (IAD). Collectively, Defendants Cline, Rowan and Kirby are referred to as Defendant Supervisory Officers.

29.     Defendant City of Chicago is a municipal corporation under the laws of the State of Illinois. The City operates the Chicago Police Department (CPD) and is responsible for the policies, practices, and customs of the City and CPD.

## Factual Background

30.     During the 2000s, Ms. McDonald would sometimes visit her aunt in the Chicago Housing Authority's Ida B. Wells housing complex.

5

31.    During the times complained of, the complex was actively patrolled by a tactical team of CPD officers, led by Defendant Watts.

32.    Watts and his tactical team members were well known to Ms. McDonald and the residents of the Ida B. Wells area.

33.    Watts and his tactical team members maintained a visible presence in the Ida B. Wells area. The Watts's team had a reputation in the community of harassing, intimidating and fabricating criminal charges against the area's residents and visitors.

34.    The Watts team's pattern of harassment continued with Ms. McDonald.

35.    Before 2005, Ms. McDonald was familiar with Defendant Watts and his corrupt crew, and just before her arrest, Defendant Watts threatened to put a case on her.

## Ms. McDonald is Framed on May 25, 2005

36.    On May 25, 2005, Ms. McDonald visited her aunt, Pamela Nooner, at 527 E. 37th Street in the Ida B. Wells housing complex ("527 Building"). Ms. McDonald's sister and friends were also present.

37.    Ms. McDonald was not doing anything illegal and she did not have any drugs.

38.    Defendant Watts and his crew illegally entered Ms. Nooner's apartment.

39.    Ms. Nooner asked the Defendant Officers why they had raided her apartment.

6

40.    Ms. Nooner also asked the Defendant Officers if they had a search warrant.

41.    Defendant Watts responded that he did not need a search warrant to conduct searches in Ida B. Wells.

42.    Defendant Watts detained Ms. McDonald and her sister, Natayvia McDonald, ordering both sisters out of the apartment.

43.    Defendant Watts ordered the McDonald sisters downstairs to the 527 Building's lobby, where Defendant Watts stated that Natayvia was going to jail.

44.    Ms. McDonald pleaded with Watts not to frame her sister, after which Defendant Watts instructed Defendant Gonzalez to "lock this bitch up, too," or words to that effect.

45.    Defendant Officers falsely arrested and transported the McDonald sisters to a police station.

46.    At the station, Defendant Watts fabricated a drug charge against Natayvia and fabricated an obstruction of justice charge against Ms. McDonald.

**Ms. McDonald is Framed Again on August 8, 2005**

47.    On August 8, 2005, Ms. McDonald was visiting her relatives in front of the 527 E. Browning Building. Ms. McDonald's friends were also present.

48.    Ms. McDonald was not doing anything illegal and she did not have any drugs.

49.    Defendant Watts and his crew arrived at the building in multiple cars, surrounding the women.

7

50.     Defendant Watts pointed at Ms. McDonald, stating he had already promised to frame her.

51.     Defendant Officers then falsely arrested and transported Ms. McDonald to Area Police station at 51st and Wentworth.

52.     Defendant Watts fabricated a drug charge against Ms. McDonald.

**Ms. McDonald Is Prosecuted, and Convicted for her August 8, 2005 arrest**

53.     The Defendant Officers prepared a false and fabricated police report related to this arrest.

54.     On the basis of said false report, Ms. McDonald was prosecuted for a drug crime. Mrs. McDonald was incarcerated pending trial until she was released on bond.

55.     Even though Ms. McDonald was innocent, knowing that she risked significant time in prison if she went to trial and lost, Ms. McDonald accepted a plea deal.

56.     Ms. McDonald was sentenced to probation, and she spent additional time in jail based on an alleged probation violation.

57.     The Defendant Officers never disclosed to the prosecutors that they had fabricated evidence and falsified a police report related to Ms. McDonald's arrest.

58.      The Defendant Officers never disclosed to the prosecutors any of their misconduct described herein. If the prosecutors had known that Defendant Officers fabricated evidence, and committed the other misconduct described herein, they

would not have pursued the prosecution of Ms. McDonald, and her unlawful deprivation of liberty would not have been continued.

59.     Given that the entirety of the State's case against Ms. McDonald rested on the credibility of Defendant Officers, the exculpatory evidence described in the preceding paragraphs would have been material to Ms. McDonald's defense of her criminal charges.

## Ms. McDonald's OPS Complaint is Ignored

60.     Shortly after her release, Ms. McDonald filed a complaint with OPS about her interactions with Defendant Watts's team and her false arrests.

61.     OPS failed to accurately report the details of Ms. McDonald's complaint and then failed to adequately investigate the complaint.

## Defendant Watts and His Team Engaged in a Pattern of Misconduct for at Least a Decade, All Facilitated by the City's Code of Silence

62.     It was no secret within CPD that Watts and his crew engaged in the type of misconduct of which Ms. McDonald accused them.

63.     Government officials, including those with the City of Chicago, knew about Watts and his crew's alleged misconduct as early as 1999.

64.     Shortly thereafter, an FBI investigation into Watts and his team was underway.

65.     The FBI investigation took place with the knowledge and occasional participation of the Chicago Police Department's Internal Affairs Division.

66.     Because IAD was kept abreast of the FBI investigation, during the times complained of, City officials—including but not limited to the head of IAD

9

and CPD Superintendent Philip J. Cline—were aware of credible allegations that Watts and his team were extorting and soliciting bribes from drug dealers.

67.     Watts used a drug dealer named "Big Shorty" to run drugs at the Ida B. Wells complex. Big Shorty would sell the drugs, turning profits over to Watts in exchange for Watts's protection. Watts also used drug dealers as phony informants to obtain illegitimate search warrants and offered to let arrestees go if they provided him with weapons.

68.     Targets of the FBI investigation extended beyond Watts to members of his tactical team, including some of the Officer Defendants named herein.

69.     During the times complained of, The FBI investigation generated evidence showing that Watts engaged in systematic extortion, theft, possession and distribution of drugs for money, planting drugs on subjects, and paying informants with drugs.

70.     Investigators also determined that Watts and his subordinates had engaged in these activities for the past 10 years.

**Watts and Mohammed Are Charged with Federal Crimes**

71.     In 2012, after engaging in criminal misconduct for at least a decade, Defendants Watts and Mohammed were caught red-handed shaking down a person they thought was a drug courier. In fact, he was an agent for the FBI.

72.     The U.S. government subsequently charged Watts and Mohammed with federal crimes.

73.     Watts and Mohammed each pled guilty to federal criminal charges and were sentenced to terms of imprisonment. *See United States v. Watts*, No. 12-CR-87-1 (N.D. Ill.); *United States v. Mohammed*, No. 12-CR-87-2 (N.D. Ill.).

74.     In its sentencing memorandum in the criminal case against Watts, the government explained that "[f]or years … the defendant [Watts] used his badge and his position as a sergeant with the Chicago Police Department to shield his own criminal activity from law enforcement scrutiny." His crimes included "stealing drug money and extorting protection payments" from the individuals he was sworn to protect and serve.

75.     The government revealed that, for years, and on numerous occasions, Defendants Watts and Mohammed extorted tens of thousands of dollars in bribes from individuals at the Ida B. Wells Homes as part of their duties with the CPD.

76.     During the sentencing hearing, the government urged Judge Sharon Johnson Coleman to "consider the other criminal conduct that the defendant [Watts] engaged in throughout the course of his career as a police officer." The government specifically noted that during the federal investigation, Watts "did other things such as putting a false case on the confidential source that was involved in our investigation. . . . [and having] him arrested on drug charges. And the source . . . felt he had no chance of successfully fighting that case so he pled guilty to a crime he didn't commit." The federal prosecutor wondered aloud "how many times [Watts] might have done something similar when the government was not involved."

11

77.     Following the federal indictments of Watts and Mohammed, City officials made efforts to downplay the magnitude of Watts's criminal enterprise.

78.     Notwithstanding the evidence investigators had amassed over the years pointing to a wide, decade-long criminal enterprise, CPD Superintendent Garry McCarthy publicly stated, "There is nobody involved other than the two officers who were arrested." As described in more detail below, that statement was incorrect.

### The City's "Code of Silence"

79.     While the federal government was investigating Watts and his crew, a "code of silence" existed within the Chicago Police Department.

80.     Under this code, police officers are expected to conceal each other's misconduct—in contravention of their sworn duties—and penalties for breaking the code of silence within the CPD are severe.

81.     As one CPD officer has explained, "[The Chicago Police Academy told officers] over and over again we do not break the code of silence. Blue is Blue. You stick together. If something occurs on the street that you don't think is proper, you go with the flow. And after that situation, if you have an issue with that officer or what happened, you can confront them. If you don't feel comfortable working with them anymore, you can go to the watch commander and request a new partner. But you never break the code of silence."

82.     Pursuant to this "code of silence," each of the Defendant Officers concealed information from Ms. McDonald that Watts and his team members were in fact engaged in a wide-ranging pattern of misconduct. Had this information been

12

disclosed, Ms. McDonald would have used it to impeach the officers' accounts, changing the outcome of the criminal proceedings instituted against her.

83.     Also, consistent with this "code of silence," the few people who stood up to Watts and his crew and/or attempted to report his misconduct were either ignored or punished, and the Defendant Officers continued to engage in misconduct with impunity.

## The Careers of CPD Officers Daniel Echeverria and Shannon Spaulding Are Nearly Ruined

84.     In 2006, two Chicago police officers, Daniel Echeverria and Shannon Spaulding, learned credible information from arrestees that Watts and his crew were engaged in illegal drug activity.

85.     Officer Echeverria took the allegation seriously, and he reported it to a CPD supervisor. The supervisor made clear that he was not interested in hearing about the allegation and directed Echeverria not to document it.

86.     Echeverria and Spaulding subsequently reported the allegations about Watts and his crew to the FBI. Soon thereafter, Echeverria and Spaulding began cooperating with the FBI, actively assisting the FBI's investigation of Watts and his crew.

87.     When their cooperation became known to officers within their CPD chain of command, Spaulding and Echeverria were labeled "rats" within the Department, their lives were threatened, and they endured all manner of professional retaliation by members of the CPD.

13

88.     Spaulding and Echeverria subsequently sued the City for the retaliation they suffered for blowing the whistle on Watts and his crew. On the eve of trial in that case, the City settled for $2 million.

### CPD Officer Michael Spaargaren's Life is Threatened

89.     Sometime in the mid-2000s, CPD Officer Michael Spaargaren was assigned to work with Watts in public housing.

90.     Spaargaren observed that Watts did not inventory drugs and money that officers seized during arrests, and he confronted Watts about the misconduct.

91.     In response, Watts threatened to plant a false case against Spaargaren and made veiled threats to kill him.

92.     A CPD lieutenant— James Spratte—subsequently warned Spaargaren to keep his mouth shut or his life would be in danger.

93.     Fearful for his life, Spaargaren opted to take a one-and-a-half-year leave of absence from CPD rather than continue to work under Watts.

### Citizen Complaints Went Nowhere

94.     Defendants Watts, Mohammed, and other members of Watt's tactical team had accumulated scores of citizen complaints concerning violations of their civil rights over the years. These complaints began well before the misconduct Defendants committed against Ms. McDonald, and yet the city did nothing to stop the misconduct.

95.     On information and belief, complaints that the City did take the time to investigate largely boiled down to he-said-she-said situations between the officer

and the citizen, and the City's policy was to resolve those disputes in the officers' favor, no matter how many citizens came forward with the same type of complaint.

96.     The Illinois Appellate Court recently criticized the City for its utter failure to address the Watts team misconduct.

97.     In multiple instances, the City actually assigned Watts to investigate complaints made against him or members of the team he supervised.

## The City Turned a Blind Eye Toward Watts and His Crew's Clear Pattern of Alleged Misconduct

98.     Despite all of the evidence that was amassed over the years of a pattern and practice of criminal misconduct by Defendant Officers, on information and belief, the City never undertook its own investigation of the clear pattern that emerged.

99.     As City officials were aware, the purpose of the FBI investigation was to investigate and prosecute criminal activity, not to discipline and control the City's Police Department.

100.    Nothing about the FBI investigation relieved the City of its fundamental responsibility to supervise, discipline, and control its officers.

101.    Nevertheless, the City completely abdicated this responsibility, allowing the widespread misconduct to continue unabated throughout the FBI's criminal investigation of Watts and his crew.

102.    During the FBI investigation, which spanned at least eight years, City officials had reason to believe that Watts and his crew were engaged in ongoing criminal activity on the streets—extorting drug dealers and framing citizens for

crimes they did not commit—yet City officials took no steps to prevent these abuses from occurring.

103. Instead, the City officials let officers on Watts's crew continue to pursue criminal charges against citizens like Ms. McDonald and continue to testify falsely against citizens like Ms. McDonald.

104. City officials withheld information they had about the officers' pattern of transgressions, information that citizens like Ms. McDonald could have used to impeach the corrupt officers and defend against the bogus criminal charges brought against them.

### Ms. McDonald's Exoneration

105. After Defendant Watts and his crew's corruption came to light, on September 12, 2017, a group of similarly-situated innocent victims filed a Consolidated Petition for Relief From Judgment and To Vacate Convictions Pursuant to 735 ILCS 5/2-1401 (Consolidated Petition).

106. On November 16, 2017, upon the State's motion, Judge LeRoy K. Martin, Jr. vacated and *nolle prossed* all of the convictions related to the Consolidated Petition.

107. In commenting on the extraordinary decision to agree to vacate all of the convictions, the director of the Cook County State's Attorney's Office's Conviction Integrity Unit, Mark Rotert, stated, "In these cases, we concluded, unfortunately, that police were not being truthful and we couldn't have confidence in the integrity of their reports and their testimony."

108. On September 24, 2018, 18 other similarly-situated innocent victims

16

were given a semblance of justice. Upon the State's motion, Judge LeRoy K. Martin, Jr. vacated 23 convictions, and the State *nolle prossed* all charges related to the convictions.

109. Following this decision, Mr. Rotert explained that "these arrests were purely conjured . . . [Watts and his team] were basically arresting people and framing them or were claiming they were involved in drug offenses that either didn't occur or didn't occur the way these police officers said."

110. At a press conference where she stood with the 18 exonerated men, CCSAO elected State's Attorney Kim Foxx stated that "[t]he system owes an apology to the men who stand behind us."

111. On November 2, 2018, seven more victims (including Ms. McDonald) had eight additional convictions voluntarily dismissed by the CCSAO.

112. In a Press Release, CCSAO Foxx stated that Watts and his team's "pattern of misconduct" has caused her "to lose confidence in the initial arrests and the validity of these convictions."

113. Referring to the exonerees as "victims," Ms. Foxx wished them "a path forward in healing and justice."

114. As of today's date, 63 men and women have had 82 convictions dismissed due to Watts and his team's misconduct. All 63 of these men and women, including Ms. McDonald, have been found factually innocent of the charges and most, including Ms. McDonald, have been certified innocent.

17

115.   The CCSAO will no longer call certain member of Watts's crew as witnesses in any pending or future matters because of their credibility concerns and alleged involvement in misconduct.

116.   In November 2017, the Superintendent of the Chicago Police Department, Eddie T. Johnson, placed some of the members of Watts's crew, on desk duty pending further investigations into their misconduct.

## Ms. McDonald's Damages

117.   Because of the Defendants acts and omissions, Ms. McDonald was subjected to police harassment and unfair criminal proceedings. The Defendants Officer's misconduct and false accusations subjected Ms. McDonald to physical injury, confinement in the Cook County jail, a felony conviction, and Plaintiff was sentenced to serve probation due to her wrongful conviction before she was finally exonerated.

118.   The emotional pain and suffering caused by being wrongfully incarcerated has been significant. Ms. McDonald was deprived of the everyday pleasures of basic human life; her freedom was taken from her. Since then, Ms. McDonald has had to live with a felony record she did not deserve.

119.   As a result of the foregoing, Ms. McDonald has suffered physical and emotional damages proximately caused by Defendants' wrongdoing.

## Count I: 42 U.S.C. § 1983 – Due Process

120.   Each paragraph of this Complaint is incorporated as if restated fully herein.

121.    In the manner described more fully above, Defendant Officers, while acting as investigators, individually, jointly, and in conspiracy with each other deprived Plaintiff of her constitutional right to due process and a fair trial.

122.    In the manner described more fully above, Defendant Officers deliberately withheld exculpatory evidence from Plaintiff and from state prosecutors, among others, and knowingly fabricated false evidence, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

123.    Likewise, in the manner described more fully above, Defendants Philip J. Cline, Karen Rowan, Debra Kirby, and other as-yet-unidentified CPD supervisors, had knowledge of Watts and his crew's pattern of misconduct. These Defendant Supervisory Officers knew of a substantial risk that Watts and his team would violate the rights of Ms. McDonald and other residents and visitors of the Ida B. Wells Homes, and they deliberately chose a course of action that allowed those abuses to continue, thereby condoning those abuses.

124.    The constitutional injuries complained of herein were proximately caused by the intentional misconduct of Defendant Supervisory Officers, or were proximately caused when Defendant Supervisory Officers were deliberately, recklessly indifferent to their subordinates' misconduct, knowing that turning a blind eye to that misconduct would necessarily violate Plaintiff's constitutional rights.

125.    In addition, Defendant Supervisory Officers themselves concealed exculpatory evidence from Ms. McDonald, specifically information about Watts and his team's pattern of misconduct. In this way, Defendant Supervisory Officers violated Ms. McDonald's due process right to a fair trial deliberately and with reckless disregard for Ms. McDonald's rights.

126.    Defendants' misconduct directly resulted in the unjust criminal conviction of Plaintiff, denying her constitutional right to due process and a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, Plaintiff could not and would not have been prosecuted.

127.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others and with total disregard for the truth and for Ms. McDonald's clear innocence.

128.    Defendants' actions were taken under color of law and within the scope of their employment.

129.    Defendant City of Chicago is also directly liable for the injuries described in this Count, because the City and CPD maintained official policies and customs that were the moving force behind the violation of Plaintiff's rights, and the actions of the final policymaking officials for the City and CPD were the moving force behind the violation of Plaintiff's rights.

130.    At all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Chicago maintained a system that

20

violated the due process rights of criminal defendants like Ms. McDonald by concealing exculpatory evidence of Chicago police officers' patterns of misconduct.

131.    In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Chicago had notice of a widespread practice by its officers and agents under which criminal suspects, such as Ms. McDonald, were routinely deprived of exculpatory evidence, were subjected to criminal proceedings based on false evidence, and were deprived of liberty without probable cause, such that individuals were routinely implicated in crimes to which they had no connection and for which there was scant evidence to suggest that they were involved.

132.    As a matter of both policy and practice, Defendant City directly encourages, and is thereby the animating force behind, the very type of misconduct at issue here by failing to adequately train, supervise, control, and discipline its police officers, such that its failure to do so manifests deliberate indifference. Defendant City's practices lead police officers in the City of Chicago to believe that their actions will never be scrutinized and, in that way, directly encourage further abuses such as those that Ms. McDonald endured.

133.    The above-described widespread practices, which were so well-settled as to constitute the de facto policy of the City of Chicago, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it. These widespread practices were allowed to flourish because Defendant City and the CPD declined to

implement sufficient policies or training, even though the need for such policies and training was obvious. Defendant City and the CPD also declined to implement any legitimate mechanism for oversight or punishment of officers, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

134.    Furthermore, the misconduct described in this Complaint was undertaken pursuant to the policy and practices of Defendant City in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago and the CPD, or were actually committed by persons with such final policymaking authority.

135.    Indeed, municipal policymakers have long been aware of Defendant City's policy and practice of failing to properly train, monitor, investigate, and discipline misconduct by its police officers but have failed to take action to remedy the problem.

136.    For example, at a City Council hearing on September 28, 1999, in response to two high-profile unjustified police shootings, Superintendent Terry Hillard noted the need for better in-service training on the use of force, early detection of potential problem officers, and officer accountability for the use of force.

137.    In June 2000, the Chairman of the Committee on Police and Fire of the Chicago City Council submitted an official resolution recognizing that "[Chicago] police officers who do not carry out their responsibilities in a professional manner

have ample reason to believe that they will not be held accountable, even in instances of egregious misconduct."

138.    In 2001, the Justice Coalition of Greater Chicago (JCGC), a coalition of more than a hundred community groups, confirmed the findings of that resolution, concluding that the CPD lacked many of the basic tools necessary to identify, monitor, punish, and prevent police misconduct. The JCGC findings were presented to Mayor Richard Daley, Superintendent Hillard, and the Chicago Police Board.

139.    Despite municipal policymakers' knowledge of the City's failed policies and practices to adequately train, supervise, investigate, discipline, and control its police officers, nothing was done to remedy these problems.

140.    As a result, the CPD has continued to respond to complaints of police misconduct inadequately and with undue delay and to recommend discipline in a disproportionately small number of cases.

141.    Indeed, by its own admissions, when a citizen complains that his or her civil rights were violated by police officers, the City sides with the police officer and concludes that no violation occurred more than 99% of the time.

142.    Notably, Defendants Watts and Mohammed were not the first Chicago police officers who were allowed to abuse citizens with impunity over a period of years while the City turned a blind eye.

143.    For instance, in 2001, Chicago Police Officer Joseph Miedzianowski was convicted on federal crime charges, including racketeering and drug conspiracy.

The jury found that Miedzianowski engaged in corruption for much of his 22-year police career, using street informants to shake down drug dealers and sell drugs.

144.    Miedzianowski, like Defendant Officers in this case, had accumulated scores of complaints over the years. As the Appellate Court has stated concerning the Defendant City, "did nothing to slow down the criminals. Instead, it informed the corrupt officers about the complaint and named the source" while ignoring evidence to the contrary. The Defendant City deemed such complaints unfounded or not sustained.

145.    Likewise, in 2011, Chicago Police Officer Jerome Finnigan was convicted and sentenced on federal criminal charges, including a charge of attempting to hire someone to kill a police officer who Finnigan believed would be a witness against him on his own corruption charges in state court.

146.    Finnigan was part of a group of officers in Defendant City's Special Operations Section that carried out robberies, home invasions, unlawful searches and seizures, and other crimes.

147.    Finnigan and his crew engaged in their misconduct at about the same time that Defendant Watts and his crew targeted Ms. McDonald .

148.    Finnigan, like Defendant Officers in this case, had accumulated scores of citizen complaints over the years, which Defendant City routinely deemed unfounded or not sustained.

149. At his sentencing hearing in 2011, Finnigan stated, "You know, my bosses knew what I was doing out there, and it went on and on. And this wasn't the exception to the rule. This was the rule."

150. In the case of *Klipfel v. Bentsen*, No. 94-cv-6415 (N.D. Ill), a federal jury found that, as of 1994, the CPD maintained a code of silence that facilitated misconduct committed by Miedzianowski.

151. Likewise, in the case of *Obrycka v. City of Chicago et al.*, No. 07 CV 2372 (N.D. Ill.), a jury found that as of February 2007 "the City [of Chicago] had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

152. The same constitutionally-defective oversight system in place during the time periods at issue in the *Klipfel* case and in the *Obrycka* case was also in place were also in place during the times complained of herein.

153. The same code of silence in place at the CPD during the time periods at issue in the *Klipfel* case and in the *Obrycka* case was also in place were also in place during the times complained of herein.

154. Indeed, the problems found to exist by the jury in *Klipfel* and *Obrycka* continue to this day. In December 2015, Mayor Rahm Emanuel acknowledged that a "code of silence" exists within the Chicago Police Department that encourages cover-ups of police misconduct and that the City's attempts to deal with police abuse and corruption have never been adequate.

155.    The policies, practices, and customs set forth above were the moving force behind the constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

156.    Defendant City's investigation of complaints is characterized by unreasonably long delays, despite the relatively straightforward nature of many misconduct claims.

157.    Although Defendant City has long been aware that its supervision, training, and discipline of police officers is entirely inadequate, it has not enacted any substantive measures to address that deficiency.

158.    Instead, Defendant City continues to inadequately investigate citizen complaints and take action against officers when necessary. It has also failed to modify its officer training programs to reduce misconduct against Chicago residents and to implement a system to identify and track repeat offenders, districts, or units.

159.    Plaintiff's injuries were caused by officers, agents, and employees of Defendant City of Chicago and the CPD, including but not limited to the individually named Defendants, who acted pursuant to the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## Count II: 42 U.S.C. § 1983 –  Fourth Amendment Claim

160.    Each paragraph of this Complaint is incorporated as if restated fully herein. In the manner described more fully above, Defendants, while acting as

161.    In the manner described more fully above, Defendants, while acting as investigators, individually, jointly, and in conspiracy with each other, accused

Plaintiff of criminal activity and exerted influence to initiate, continue, and

perpetuate judicial proceedings against Plaintiff without any probable cause for

doing so and in spite of the fact that they knew Plaintiff was innocent.

162.    In doing so, Defendants caused Plaintiff to be unreasonably seized

without probable cause and deprived of her liberty, in violation of Plaintiff's rights

secured by the Fourth and Fourteenth Amendments.

163.    The false judicial proceedings against Plaintiff were instituted

and continued maliciously, resulting in injury.

164.    Defendants deprived Plaintiff of fair state criminal proceedings,

including the chance to defend herself during those proceedings, resulting in a

deprivation of her liberty.

165.    In addition, Defendants subjected Plaintiff to arbitrary governmental

action that shocks the conscience in that Plaintiff was deliberately and intentionally

framed for a crime of which she was totally innocent through Defendants'

fabrication and suppression of evidence.

166.    The misconduct described in this Count was objectively unreasonable

and was undertaken intentionally, with reckless and deliberate indifference to the

rights of others, and with total disregard for the truth and for Plaintiff's clear

innocence.

167.    The Defendants' actions were taken under color of law and within the

scope of their employment.

168.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

169.    Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Chicago, and by Defendants who were final policymakers for Defendant City of Chicago, in the manner described more fully above.

### Count III: 42 U.S.C. § 1983 – Failure to Intervene

170.    Each paragraph of this Complaint is incorporated as if restated fully herein.

171.    In the manner described more fully above, during the constitutional violations described herein, Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

172.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others and with total disregard for the truth and for Plaintiff's innocence.

173.    The Defendants' actions were taken under color of law and within the scope of their employment.

174.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical

and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

175.   Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Chicago and by Defendants who were final policymakers for Defendant City of Chicago, in the manner described more fully above.

### Count IV: 42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights

176.   Each paragraph of this Complaint is incorporated as if restated fully herein.

177.   Prior to Plaintiff's conviction, all of the Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime she did not commit and thereby to deprive her of her constitutional rights, all as described above.

178.   In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability by depriving Plaintiff of her rights.

179.   In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

180.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and with total disregard for the truth and for Plaintiff's innocence.

181.   The Defendants' actions were taken under color of law and within the scope of their employment.

182.   As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

183.   Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Chicago and by Defendants who were final policymakers for Defendant City of Chicago, in the manner described more fully above.

## Count V: Illinois Law – Malicious Prosecution

184.   Each paragraph of this Complaint is incorporated as if restated fully herein.

185.   In the manner described more fully above, Defendants accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

186.   In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

187.   The Defendants' actions were taken under color of law and within the scope of their employment.

188.   As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical

and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### Count VI: Illinois Law – Intentional Infliction of Emotional Distress

189.    Each paragraph of this Complaint is incorporated as if restated fully herein.

190.    The actions, omissions, and conduct of Defendant Officers, as set forth above, were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

191.    The Defendants' actions were taken under color of law and within the scope of their employment.

192.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### Count VII: Illinois Law – Civil Conspiracy

193.    Each paragraph of this Complaint is incorporated as if restated fully herein.

194.    As described more fully in the preceding paragraphs, Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime she did not commit and conspired by concerted action to accomplish an unlawful purpose by an unlawful

31

means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of her rights.

195.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

196.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and with total disregard for the truth and for Plaintiff's innocence.

197.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### Count VIII: Illinois Law – *Respondeat Superior*

198.    Each paragraph of this Complaint is incorporated as if restated fully herein.

199.    While committing the acts alleged in the preceding paragraphs, Defendant Officers were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

200.    Defendant City of Chicago is liable as principal for all torts committed by their agents.

### Count IX: Illinois Law – Indemnification

201.    Each paragraph of this Complaint is incorporated as if fully reinstated herein.

202.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment.

203.    Defendant Officers were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiff Octayvia McDonald, Jr., respectfully requests that this Court enter a judgment in her favor and against the City of Chicago, former Chicago Police Sergeant Ronald Watts, Officer Robert Gonzalez, Officer Brian Bolton, Officer Elsworth J. Smith, Jr., Philip J. Cline, Debra Kirby, Karen Rowan and other as-yet-unidentified officers of the Chicago Police Department, awarding compensatory damages, attorneys' fees and costs against each Defendant, punitive damages against each of the individual Defendants, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, Octayvia McDonald, Jr., hereby demands a trial by jury pursuant to

Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

/s/ Theresa Kleinhaus
One of Plaintiffs' Attorneys

Jon Loevy
Arthur Loevy
Scott Rauscher
Theresa Kleinhaus
Joshua Tepfer
Sean Starr
Loevy & Loevy
311 N. Aberdeen Third Floor
Chicago, Illinois 60607
Phone: (312) 243-5900